UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| TINA DAVIS MYERS, | ) | CASE NO.:   5:24-cv-00792 |
| | ) | |
| Plaintiff, | ) | JUDGE BRIDGET MEEHAN BRENNAN |
| | ) | |
| v. | ) | |
| | ) | |
| THE SHELLY COMPANY, | ) | **MEMORANDUM OPINION AND** |
| | ) | **ORDER** |
| Defendant. | ) | |

Before the Court is Defendant The Shelly Company's ("The Shelly Company" or

"Defendant") Motion for Summary Judgment.  (Doc. 31.)  *Pro se* Plaintiff Tina Davis Myers

("Myers" or "Plaintiff") opposed the motion (Doc. 35), and The Shelly Company replied (Doc.

36).  For the reasons stated herein, The Shelly Company's Motion for Summary Judgment is

GRANTED.

## I.      BACKGROUND

### A.      Undisputed Facts

The Shelly Company is in the business of highway paving and other construction

projects.  (Doc. 31-1 (Martin Decl.) at ¶ 3.)  It hired seasonal laborers and regularly laid off

employees in the fall and winter months.  (*Id.* at ¶ 5.)  In the spring, The Shelly Company called

laborers for projects, depending on the weather, availability, and employee skill sets.  (*Id.*)

Myers, who is African American, was a seasonal laborer with The Shelly Company.  (*Id.*; *see

also* Doc. 12-1 at 68.)[1]  She began working at The Shelly Company in 2008.  (Doc. 31-1 at ¶ 5.)

She was seasonally laid off and re-hired on multiple occasions.  (*Id.*; *see also id.* at 190-91.)

---

[1] For ease and consistency, record citations are to the electronically stamped CM/ECF document

Around July 9, 2022, Gerry Talmon ("Talmon"), a white, male co-worker, wore a wig to work.  (Doc. 31-2 (Dvorak Decl.) at ¶ 5; Doc. 31-1 (Martin Decl.) at ¶¶ 7-8; *id.* at 193.)  To Myers, Talmon was mocking her hair and humiliating her.  (Doc. 31-1 (Martin Decl.) at ¶¶ 7-8.)  Other employees witnessed the incident, including the foreman on Myers' shifts and two other co-workers.  (Doc. 31-1 at ¶ 9.)  Two of the witnesses confirmed Talmon asked to take a picture with Myers while he was wearing the wig.  (*Id.*)  One of these witnesses sent Myers a text message with the picture "in case she wanted to report the incident."  (*Id.*; *see also* Doc. 31-1 at 195.)  Talmon claimed, as the result of a prior discussion with Myers about the wig, Myers requested he bring the wig to work so she could see it.  (*Id.* at ¶ 10.)

Another of Myers' supervisors, Superintendent Alex Jones ("Jones"), did not see the incident but was made aware of it later.  (Doc. 31-4 (Jones Decl.) at ¶¶ 3-4.)  Jones, who is also African American, viewed the conduct as inappropriate but did not view it to be race, color, or sex-related harassment or discrimination.  (*Id.* at ¶¶ 4-5.)  Jones immediately approached Talmon, told him that his behavior was inappropriate, and instructed him to apologize to Myers.  (*Id.*)  Talmon apologized, and Jones was not aware of any other conflicts between Myers and Talmon.  (*Id.* at ¶ 4.)  Had Jones "perceived [Talmon's] actions to be a form of unlawful discrimination or harassment," or if he "personally heard or received a complaint that [Talmon] made a sexist or racist remark," he would have immediately reported it to Human Resources for investigation.  (*Id.* at ¶ 5.)

On March 9, 2023, Myers reported the incident to Bill Dvorak ("Dvorak"), Vice President of Construction.  (Doc. 31-1 (Martin Decl.) at ¶ 7; *id.* at 193; Doc. 31-2 (Dvorak Decl.) at ¶ 5.)  The same day, Tasha Martin ("Martin"), a Human Resources Manager, began an

---

and PageID# rather than any internal pagination.

investigation.  (Doc. 31-1 (Martin Decl.) at ¶¶ 7, 8; *id.* at 193.)  She interviewed Myers.  (*Id.*)

Myers told Martin the incident humiliated her.  (*Id.* at ¶ 8; *id.* at 193.)  She provided HR with a

photo of Talmon wearing the wig.  (*Id.*; *see also id.* at 195.)  She disputed Talmon's claim she

asked him to bring the wig to work.  (*Id.* at ¶ 11.)  Martin then interviewed the two other co-

workers who witnessed the incident.  (*Id.* at ¶ 9; *id.* at 193-94.)  She also interviewed Jones and

Talmon.  (*Id.* at ¶¶ 10, 11; *id.* at 194.)  Martin determined Talmon violated The Shelly

Company's policy on Prohibition of Harassment, Discrimination, and Retaliation and

recommended he not be rehired.  (*Id.* at ¶ 12; *id.* at 179-81, 183-84, 194.)  Talmon was not

rehired.  (*Id.* at ¶ 12; *id.* at 194.)

Myers was seasonally laid off during the winter of 2022/2023.  (*Id.* at ¶ 5.)  In the

interim, The Shelly Company hired a new personnel coordinator, Kyle Eicher ("Eicher").  (Doc.

31-2 (Dvorak Decl.) at ¶ 11.)  Eicher created a revised eligible worker list.  (*Id.*)  Management

was not made aware of the new eligible worker list.  (*Id.*)  Myers was included on the list.  (*Id.* at

¶¶ 11, 14.)  On or about May 5, 2023, Dvorak learned Myers had not yet been called back.  (*Id.*

at ¶ 11.)  He asked Eicher to call Myers.  (*Id.*)  Dvorak also asked Ken Juhasz ("Juhasz"), one of

Myers' co-workers, to call her as well.  (*Id.*; *see also* Doc. 29 (Juhasz Dep.) at 143-44.)  Neither

Eicher nor Juhasz were aware of the wig incident.  (Doc. 31-2 (Dvorak Decl.) at ¶ 13; Doc. 29 at

143.)

On May 5, 2023, and again on May 6, 2023, Eicher and Juhasz each called Myers about

two separate jobs.  (Doc. 31-2 (Dvorak Decl.) at ¶¶ 11-15; *id.* at 208, 210, 212-13; Doc. 29 at

143-45; *see also* Doc. 31-3 (Klaben-Finegold Decl.) at 232-38 (Reqs. for Admis.), Nos. 7-10.[2])

---

[2] Myers failed to timely respond to The Shelly Company's Requests for Admission.
Accordingly, each is deemed admitted.  FED. R. CIV. P. 36(a)(3).

She declined the first job and did not answer a call they placed to her on May 6.  (*Id.*)  On May 8, 2025, Myers returned the May 6 phone call and stated that the assignments, located near Cleveland, were too far of a commute.  (*Id.*)  The Shelly Company continued to attempt to place Myers until May 18, 2025, when all available jobs had already been filled.  (*Id.*)  Myers remained on The Shelly Company's eligible worker list, although declining past offers "bump[ed] [her] down."  (Doc. 31-2 (Dvorak Decl.) at ¶ 14; *id.* at 212-13.)  Projects near Cleveland also disfavored Myers because The Shelly Company had to hire members of a separate Cleveland union.  (*Id.*)

Employees who did not return to work after six months were automatically deactivated in The Shelly Company's payroll system and administratively marked "TERMRIF."  (Doc. 31-1 (Martin Decl.) at ¶ 6; Doc. 31-2 (Dvorak Decl.) at ¶ 16; Doc. 31-5 (Kellermeyer Decl.) at ¶¶ 3-8.)  On May 20, 2023, Myers was removed from the eligible worker list through an automatic process due to her "TERMRIF" status.  (*Id.*)  Amie Kellermeyer ("Kellermeyer"), the administrator who took this action, had no knowledge of Myers's complaint.  (Doc. 31-5 (Kellermeyer Decl.) at ¶¶ 7, 8.)  Employees marked "TERMRIF" remained eligible for rehire.  (Doc. 31-1 (Martin Decl.) at ¶ 6.)  However, a new personnel coordinator was hired after Eicher resigned on May 12, 2023.  (Doc. 31-2 (Dvorak Decl.) at ¶ 16.)  This new personnel coordinator did not have Myers on his eligible worker list due to the administrator's modifications.  (*Id.*)  Myers made no further contact with The Shelly Company.  (*Id.* at ¶ 17.)  Later in 2023, Myers began working for a separate construction company.  (Doc. 31-3 at 280; Doc. 31 at 160.)

**B.** **Procedural History**

On August 21, 2024, Myers amended her *pro se* complaint.[3]  (Doc. 12; Doc. 12-1.)

---

[3] On December 13, 2024, William Dvorak was dismissed as a Defendant.  (*See* Doc. 22;

On August 11, 2025, The Shelly Company moved for summary judgment. (Doc. 31.) On August 15, 2025, Myers filed a response in opposition that neither attached nor cited to any record evidence. (Doc. 25.) In reply, The Shelly Company highlighted Myers's failure to present any evidence demonstrating a genuine issue of fact. (Doc. 36 at 311, 315.)

## II.  LAW AND ANALYSIS

### A.  Legal standard

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." FED. R. CIV. P. 56(a). "Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, and affidavits show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. The moving party bears the burden of showing that no genuine issues of material fact exist." *Williams v. Maurer*, 9 F.4th 416, 430 (6th Cir. 2021) (citations and quotations omitted). A "material" fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). "[A] genuine dispute of material fact exists if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Abu-Joudeh v. Schneider*, 954 F.3d 842, 849-50 (6th Cir. 2020) (citations and quotations omitted).

"Once the moving party satisfies its burden, the burden shifts to the nonmoving party to set forth specific facts showing a triable issue of material fact." *Queen v. City of Bowling Green, Ky.*, 956 F.3d 893, 898 (6th Cir. 2020) (quotation and citations omitted). On summary judgment, the inferences to be drawn from the underlying facts must be viewed in the light most favorable

---

December 13, 2024, Order.)

to the party opposing the motion. *Kalamazoo Acquisitions, L.L.C. v. Westfield Ins. Co.*, 395 F.3d 338, 342 (6th Cir. 2005). A party asserting or disputing a fact must cite evidence in the record or show the record establishes either the absence or the presence of a genuine dispute. *See* FED. R. CIV. P. 56(c) & (e). Rule 56 also provides "[t]he court need consider only" the evidentiary materials cited in the parties' briefs. FED. R. CIV. P. 56(c)(2); *see also Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989) ("The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.").

"Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) (quotation and citation omitted). The Court's role is not to make credibility determinations or "weigh" conflicting evidence. *Payne v. Novartis Pharms. Corp.*, 767 F.3d 526, 530 (6th Cir. 2014). "The ultimate question is whether the evidence presents a sufficient factual disagreement to require submission of the case to the jury, or whether the evidence is so one-sided that the moving parties should prevail as a matter of law." *Id.*

"When the moving party has carried this burden, 'its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.'" *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009) (quoting *Matsushita*, 475 U.S. at 586). "Instead, the nonmoving party must present affirmative evidence to defeat a properly supported motion for summary judgment." *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995). This means the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." *Moldowan*, 578 F.3d at 374; FED. R. CIV. P. 56(e).

While *pro se* plaintiffs are entitled to liberal construction of their pleadings and filings, that leniency does not extend to summary judgment.  Liberal construction does not equate to "lenient treatment of substantive law, and the liberal standards that apply at the pleading stage do not apply after a case has progressed to the summary judgment stage." *Johnson v. Stewart*, No. 08-1521, 2010 U.S. App. LEXIS 27051, 2010 WL 8738105, at *3 (6th Cir. May 5, 2010) (citations omitted).  A *pro se* plaintiff cannot oppose summary judgment simply by presenting unsworn statements in an opposition brief.  Like every other litigant opposing a summary judgment motion, she must properly support her opposition with "facts that can be established by admissible evidence." *Amini v. Oberlin College*, 440 F.3d 350, 357 (6th Cir. 2006); FED. R. CIV. P. 56(e)(2); *see also Viergutz v. Lucent Techs., Inc.*, 375 F. App'x 482, 485 (6th Cir. 2010).

**B.**      **Hostile Work Environment**

Title VII prohibits employers from discriminating against an employee because of the employee's "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1); *see Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993).  To assert a cause of action under Title VII for a hostile work environment, a plaintiff must make direct or inferential allegations that:

> (1) she belonged to a protected group, (2) she was subject to unwelcome harassment, (3) the harassment was based on [her protected status], (4) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment, and (5) the defendant knew or should have known about the harassment and failed to act.

*Waldo v. Consumers Energy Co.*, 726 F.3d 802, 813 (6th Cir. 2013) (quoting *Williams v. CSX Transp. Co.*, 643 F.3d 502, 511 (6th Cir. 2011)).  A hostile work environment exists when "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive

working environment." *Smith v. Rock-Tenn Servs., Inc.*, 813 F.3d 298, 309 (6th Cir. 2016) (quoting *Harris*, 510 U.S. at 21).

"The determination of whether harassing conduct is sufficiently severe or pervasive to establish a hostile work environment is not susceptible to a mathematically precise test." *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 333 (6th Cir. 2008) (internal quotation marks omitted).  Courts must look at "all the circumstances," including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23.  "The harassment should be ongoing, rather than a set of isolated or sporadic incidents." *Clark v. United Parcel Serv., Inc.*, 400 F.3d 341, 351 (6th Cir. 2005).

Under this totality-of-circumstances test, "the issue is not whether each incident of harassment *standing alone* is sufficient to sustain the cause of action in a hostile environment case, but whether—taken together—the reported incidents make out such a case." *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 562 (6th Cir. 1999); *see also Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81-82, 118 S. Ct. 998, 140 L. Ed. 2d 201 (1998) ("The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed.").  "In a hostile-work-environment claim, the actionable wrong is the environment, not the individual acts that, taken together, create the environment." *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 708 (6th Cir. 2007) (internal citation and quotation marks omitted).

The Sixth Circuit "follow[s] the familiar *McDonnell Douglas* burden-shifting analysis

when considering hostile-work-environment claims."  *Johnson v. DeJoy*, No. 23-1813, 2024 U.S. App. LEXIS 13961, 2024 WL 2874573, at *7 (6th Cir. June 7, 2024); *Clay*, 501 F.3d at 706. "[T]he employee has the initial burden of establishing his prima facie case; if he does so, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its actions; finally, the employee has the burden of rebutting the employer's proffered reasons by showing them to be pretextual."  *Demyanovich v. Cadon Plating & Coatings, L.L.C.*, 747 F.3d 419, 427 (6th Cir. 2014); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).

Neither party disputes Myers belongs to a protected group and was subject to unwelcome harassment.  *Waldo*, 726 F.3d at 813.  The Shelly Company's challenges focus on elements three through five of Myers' *prima facie* case.[4]

### 1.     Harassment Based on Protected Status

"[E]vidence that may not have been explicitly accompanied by a racial or national origin slur may still contribute to a hostile work environment."  *Calderon v. Ford Motor Credit Co.*, 300 F. App'x. 362, 369 (6th Cir. 2008); *Jackson v. Quanex Corp.*, 191 F.3d 647, 662 (6th Cir. 1999) ("[E]ven though a certain action may not have been specifically racial in nature, it may contribute to the plaintiff's proof of a hostile work environment if it would not have occurred but for the fact [of the plaintiff's protected status].").  Discrimination based on sex is no different.  "Facially neutral incidents may be included in a hostile-work-environment analysis of the totality of the circumstances when there is some circumstantial or other basis for inferring that incidents sex-neutral on their face were in fact discriminatory."  *Waldo*, 726 F.3d at 815.

---

[4] The parties' arguments focus on Myers' *prima facie* case.  Because the parties did not brief the issue of pretext on this claim, the Court will not address it.

On this point, The Shelly Company contends there is insufficient evidence from which a jury could infer the wig incident was "based on race, color, or gender." (Doc. 31 at 161.)  Myers urges the opposite and asserts The Shelly Company's argument "is contradicted by the nature of the act and testimony from witnesses who recognized the targeted nature of the mockery." (Doc. 35 at 306.)  At this stage, Myers is entitled to all reasonable inferences drawn from the evidence provided, namely the photograph.  (*See* Doc. 31-1 at 195.)  Because the photograph alone provides evidence from which a jury could infer Talmon harassed Myers because of her race, color, or gender, Myers' *prima facie* case is satisfied as to element three.

### 2. Sufficiently Severe or Pervasive

To satisfy this element of her *prima facie* case, Myers "must present evidence showing that under the 'totality of the circumstances' the harassment was 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Clay*, 501 F.3d at 707 (quoting *Williams*, 187 F.3d at 560, 562).  These circumstances "include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23.  The Supreme Court recently held Title VII discrimination claims do not require plaintiffs to show "significant" harm.  *Muldrow v. City of St. Louis, Missouri*, 601 U.S. 346, 355, 144 S. Ct. 967, 218 L. Ed. 2d 322 (2024).

The Sixth Circuit extended this standard to Title VII hostile work environment claims. *See McNeal v. City of Blue Ash, Ohio*, 117 F.4th 887, 904 (6th Cir. 2024) ("Because hostile-work-environment claims arise out of the same statutory language as disparate-treatment claims, *Muldrow's* holding that Title VII does not require plaintiffs to show 'significant' harm applies to both types of claims.").  "Thus, when we consider whether a hostile-work environment was

severe or pervasive enough to violate Title VII, we effectively ask whether it left an employee 'worse off respecting employment terms and conditions.'" *McNeal*, 117 F.4th at 904 (quoting *Muldrow*, 601 U.S. at 355). "*McNeal* did not discard the objective standard that stands as a core requirement to hostile-work-environment claims." *Kellar v. Yunion, Inc.*, 157 F.4th 855, 872 (6th Cir. 2025) (citing *McNeal*, 117 F.4th at 898). Rather, "[f]or summary judgment purposes, once a plaintiff provides evidence that the environment itself was objectively hostile to the protected class, so long as the hostility 'produce[d] some harm respecting an identifiable term or condition of employment,' he meets his burden." *Id.* at 873 (quoting *McNeal*, 117 F.4th at 904).

"[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998). While a single incident may suffice, it must be "extremely serious" to support a hostile work environment claim. *Williams*, 643 F.3d at 512 (quoting *Faragher*, 524 U.S. at 788); *Ault v. Oberlin College*, 620 F. App'x 395, 403 (6th Cir. 2015) (finding that a supervisor pressing against the plaintiff so she could feel his penis, physically positioning himself so she could not move, and ignoring her repeated requests to stop, was "severe"). The complained of conduct must be "severe *or* pervasive; it need not be both." *Ault*, 620 F. App'x at 402.

Directing the Court to several Sixth Circuit decisions, The Shelly Company contends the conduct at issue here is not "sufficiently severe or pervasive." (Doc. 31 at 161-62.) With no citation to record evidence or legal authority, Myers contends this single incident was "severe enough to constitute a hostile work environment" because it was "humiliating, degrading, and targeted towards protected traits" and caused her "lasting humiliation, emotional distress, and a chilling effect on her work environment." (Doc. 35 at 306.) To her, the issue is for a jury. (*Id.*)

Case law does not support Myers' contention.  For example, in *Williams*, multiple racist comments made by a supervisor over a two-year period were not found to be sufficiently severe or pervasive to establish a *prima facie* case for a hostile work environment claim.  643 F.3d at 506 (holding multiple inappropriate comments by supervisor about black people to African American employee, including that black people should "go back to where [they] came from," was insufficiently severe or pervasive).  In *Reed v. Procter & Gamble Mfg. Co.*, 556 F. App'x 421, 432-33 (6th Cir. 2014), the supervisor of an African American employee made a noose out of telephone cord behind their seat while a separate employee asked "[a]re you fixing to hang someone?"  In assessing this and other incidents of racial discrimination, the court found this incident was "isolated" and that the overall alleged conduct "is not sufficiently severe or pervasive to support" a hostile work environment.  *Id.* at 433.

Citing no case law or Rule 56 evidence in support of her claim, Myers has not met her burden to establish the fourth element of her *prima facie* case.  And the case law is not in her favor.  Even crediting Myers' claim she was humiliated and disrespected based on her race, the lone incident does not, as a matter of law, rise to the level of being sufficiently severe or pervasive.

### 3.      Knowledge and Failure to Act

Myers must show The Shelly Company's response to her complaint "manifest[ed] indifference or unreasonableness in light of the facts the employer knew or should have known."  *Hawkins*, 517 F.3d at 338 (internal quotation marks omitted); *see Jackson*, 191 F.3d at 659 (explaining that the plaintiff must show the employer "tolerated or condoned the situation or that the employer knew or should have known of the alleged conduct and failed to take prompt remedial action" (internal quotation marks omitted)).

"[A]n appropriate corrective response will vary according to the frequency and severity of the alleged harassment." *Bell v. Chesapeake & Ohio Ry. Co.*, 929 F.2d 220, 224 (6th Cir. 1991).  "Generally, a response is adequate if it is reasonably calculated to end the harassment." *Jackson*, 191 F.3d at 663.  Steps that would "establish a base level of reasonably appropriate corrective action" may include promptly initiating an investigation to determine the factual basis for the complaint, "speaking with the specific individuals identified by [the complainant], following up with [the complainant] regarding whether the harassment was continuing, and reporting the harassment to others in management." *Waldo*, 726 F.3d at 814 (quoting *West v. Tyson Foods, Inc.*, 374 F. App'x. 624, 633 (6th Cir. 2010)).

In its motion, The Shelly Company presents evidence Jones learned of the conduct in July 2022, but he did not report it to the Human Resources because, to his mind, the conduct did not rise to the level of discrimination or harassment.  (Doc. 31-4 (Jones Decl.) at ¶¶ 4, 5.) Notwithstanding, Jones spoke with Talmon immediately after the incident, told Talmon the behavior was not acceptable, and directed him to apologize to Myers.  (*Id.*)  Myers did not complain until March 9, 2023, when she reported the incident to Dvorak.  (Doc. 31-2 (Dvorak Decl.) at ¶ 5.)  The same day, Martin, a Human Resources Manager, began an investigation. (Doc. 31-1 (Martin Decl.) at ¶¶ 7, 8; *id.* at 193-95.)

"Title VII requires a reasonably prompt corrective response, not a perfect response." *Burns v. Berry Glob., Inc.*, No. 21-5359, 2022 U.S. App. LEXIS 3590, 2022 WL 351769, at *7 (6th Cir. Feb. 7, 2022).  Decisive action that stops harassing or discriminatory behavior is sufficient to relieve a defendant of liability.  *See Doe v. City of Detroit, Michigan*, 3 F.4th 294, 301 (6th Cir. 2021) (immediately removing and replacing defaced name plate seen as reasonable corrective action); *Garcia v. Beaumont Health Royal Oak Hosp.*, No. 22-1186, 2022 U.S. App.

LEXIS 28085, 2022 WL 5434558, at *4 (6th Cir. Oct. 7, 2022) (no liability for defendant when investigation and warning issued to perpetrator resulted in no subsequent incidents of harassment).

In her brief, Myers asserts, without any supporting evidence, she "first complained in July 2022 to a manager who failed to escalate the matter for months." (Doc. 35 at 307.) "HR did not investigate until March 2023 – eight months after the incident – undermining Defendant's 'prompt remedial action' defense." (*Id.*) Here, Myers presents no evidence to dispute that Jones acted and Talmon's behavior stopped. (Doc. 31-1 (Martin Decl.) ¶¶ 10, 11; *id.* at 194; Doc. 31-4 (Jones Decl.) at ¶ 4.) When Myers reported the incident to Dvorak, HR immediately investigated. (Doc. 31-1 (Martin Decl.) at ¶ 7; *id.* at 193-95.) The investigation led to the recommendation that Talmon not be rehired, which the company approved. (*Id.* at ¶ 12; *id.* at 195.) Thus, The Shelly Company reasonably responded and took corrective action. Myers has put forth no evidence to establish a genuine issue of fact. She has failed to establish a *prima facie* case of a hostile work environment.[5]

### C. Retaliation

"Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 339, 133 S. Ct. 2517, 186 L. Ed. 2d 503 (2013). "To make a prima facie showing of Title VII retaliation, an employee must show '(1) [s]he . . . engaged in protected activity, (2) the employer knew of the exercise of the protected right, (3) an adverse employment action was subsequently taken against the employee, and (4) there was a causal connection between the protected activity

---

[5] Because Myers failed to establish a *prima facie* case of a hostile work environment, the Court need not address The Shelly Company's affirmative defense.

and the adverse employment action.'" *Laughlin v. City of Cleveland*, 633 F. App'x 312, 315 (6th Cir. 2015) (quoting *Niswander v. Cincinnati Ins. Co.*, 529 F.3d 714, 720 (6th Cir. 2008)).

The *McDonnell Douglas* burden shifting analysis also applies to Myers' retaliation claim. *See McDonnell Douglas Corp.*, 411 U.S. at 800-06; *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014). If the employee establishes a *prima facie* case, the employer has the burden to produce a "legitimate, nondiscriminatory reason for its actions." *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 544 (6th Cir. 2008). If this burden is met, the employee must then demonstrate the reason offered "was a pretext designed to mask retaliation." *Id.*

Neither party disputes Myers engaged in a protected activity. The Shelly Company argues Myers has not established a *prima facie* case because she has not proven that (1) "the manager who decided to take the challenged adverse employment action had prior knowledge of [Myers'] protected activity," (2) "[t]hat she suffered an adverse action," and (3) that there is a causal connection between Myers's protected activity and the adverse employment action. (Doc. 31 at 164-66.) Myers contends "decision-makers knew of her complaint" prior to her "TERMRIF" status, her "TERMRIF" status was an adverse employment action, and that a causal connection exists between her complaint and subsequent removal from The Shelly Company's recall list. (Doc. 35 at 307.) The Court addresses each disputed element in turn.

### 1. Knowledge

Myers must prove The Shelly Company knew she engaged in protected activity. *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 860 (6th Cir. 1997). "Under Title VII, there are two types of protected activity: participation in a proceeding with the Equal Employment Opportunity Commission ("EEOC") and opposition to an apparent Title VII violation." *Wasek*, 682 F.3d 463, 469 (6th Cir. 2012). "Circumstantial evidence can support a reasonable inference

of the decisionmaker's knowledge if the evidence is comprised of 'specific facts' and not merely 'conspiratorial theories, flights of fancy, speculations, hunches, intuitions, or rumors.'" *Evans v. Prof. Transp., Inc.*, 614 F. App'x 297, 300 (6th Cir. 2015) (quoting *Mulhall v. Ashcroft*, 287 F.3d 543, 552 (6th Cir. 2002)).  Because "[t]he decisionmaker's knowledge of the protected activity is an essential element of the prima facie case of unlawful retaliation," *Frazier v. USF Holland, Inc.*, 250 F. App'x 142, 148 (6th Cir. 2007), Myers must "establish that the individuals charged with taking the adverse employment action knew of the protected activity." *Mulhall*, 287 F.3d at 552; *see also Fenton v. HiSAN, Inc.*, 174 F.3d 827, 832 (6th Cir. 1999) ("[Plaintiff] has not met her burden of showing that her protected activity was known to those who made that decision.").

The Shelly Company argues the administrator who removed Myers from the eligible worker list and the personnel coordinator responsible for contacting her had no knowledge of her complaint, and therefore no decisionmaker knowledge exists.  (Doc. 31 at 165.)  In opposition, Myers states that "the recall system was discretionary and that decision-makers knew of her complaint."  (Doc. 35 at 307.)  In reply, The Shelly Company claims Myers does not support her contentions with any evidence.  (Doc. 36 at 316.)

On March 9, 2023, Myers informed Dvorak of the wig incident.  (Doc. 31-2 (Dvorak Decl.) at ¶ 5.)  During this time, Dvorak was The Shelly Company's Vice President of Construction.  (*Id.* at ¶ 2.)  After being informed of the incident, Dvorak contacted Jones and Human Resources to begin an investigation and gather information.  (*Id.* at ¶¶ 5, 7.)  Following the investigation, Dvorak consulted with Human Resources and determined not to rehire Talmon. (*Id.* at ¶ 8.)  On or about May 5, 2023, Dvorak directed Eicher, the personnel coordinator, and Juhasz, an employee Myers knew, to contact her with work opportunities because she had not yet been rehired.  (*Id.* at ¶ 11.)  Dvorak, as Vice President of Construction for The Shelly Company,

was clearly aware of Myers' protected activity.  He could also influence employment decisions and the rehiring of seasonal employees, including Myers.  Dvorak did not follow up to see if Myers was rehired following her "TERMRIF" status and removal from the eligible worker list. (*Id.* at ¶ 17.)

Knowledge may be imputed to the employer when an individual with knowledge of the protected activity was the "driving force behind the employment action."  *Roberts v. Principi*, 283 F. App'x 325, 333 (6th Cir. 2008); *Bivens v. Zep, Inc.*, 147 F.4th 635, 649 (6th Cir. 2025). As discussed below, the parties dispute whether an adverse employment action took place, and if so, what the action was.  Even so, Dvorak had knowledge of Myers' protected activity and was involved in compelling others to contact her with work opportunities, regardless of her "TERMRIF" status.  To Myers, The Shelly Company's failure to continue to offer her job opportunities constituted an adverse employment action, even after she was marked "TERMRIF."  (Doc. 35 at 307.)  A genuine issue of material fact exists whether and to what extent Dvorak and others were involved in failing to rehire Myers.  There is enough evidence to conclude Myers has met her burden of establishing decisionmaker knowledge.

### 2.     Adverse Employment Action

An "adverse employment action" is a "materially adverse change in the terms and conditions of employment."  *White v. Burlington N. & Santa Fe Ry. Co.*, 364 F.3d 789, 795 (6th Cir. 2004) (quotations omitted).  Such changes include "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."  *Id.* at 798 (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998)).

The Shelly Company contends Myers cannot establish she suffered an adverse action because (1) she was seasonally laid off, (2) they "made multiple attempts to return her to work," and (3) Myers refused these attempts.  (Doc. 31 at 164-65.)  Myers refutes these arguments by claiming failure to timely recall her and removal from the eligible worker list (and her resulting loss of income) constitute adverse actions under Title VII.  (Doc. 35 at 307.)  Myers also asserts the "TERMRIF" and "seasonal" justifications do not change the fact that she was excluded from work opportunities.  (*Id.*)

As a seasonal laborer, Myers was seasonally laid off and rehired by The Shelly Company at various times since 2009.  (Doc. 31-1 (Martin Decl.) at ¶ 5; *see also id.* at 190-91.)  For example, in 2022, Myers was rehired from a seasonal layoff on May 24.  (*Id.*)  On November 17, 2022, Myers was again seasonally laid off.  (*Id.*)  Often, Myers experienced a seasonal layoff in October, November, or early-December and was re-hired the following year in March, April, or May.  (*Id.*)

This pattern was unaltered following the incident at issue here.  Starting in May, Myers received multiple opportunities for work that she declined or did not timely respond to.  (Doc. 31-2 (Dvorak Decl.) at ¶¶ 11-15; *id.* at 208, 210, 212-13; Doc. 29 at 143-45; *see also* Doc. 31-3 at 232-38, Nos. 7-10.)  Myers waited multiple days to respond to one such inquiry, leading The Shelly Company to offer this opportunity to other workers.  (*Id.*)  Myers was marked "TERMRIF" in late-May due to six months of inactivity, partially because she turned down or failed to timely follow-up on these opportunities.  (Doc. 31-1 (Martin Decl.) at ¶ 6; Doc. 31-2 (Dvorak Decl.) at ¶ 16; Doc. 31-5 (Kellermeyer Decl.) at ¶¶ 3-8.)  She was automatically culled from the eligible worker list and the administrator who oversaw this action had no knowledge of her complaint.  (Doc. 31-5 (Kellermeyer Decl.) at ¶¶ 6-8.)  It was only in late-May that

employees realized Myers had been removed from this list.  (Doc. 31-2 (Dvorak Decl.) at ¶¶ 14-16.)  That Myers was not contacted until May about upcoming opportunities does not constitute a "materially adverse change in the terms and conditions of employment."  *White*, 364 F.3d at 795.

Neither does being labeled "TERMRIF" in The Shelly Company's payroll database. Being marked "TERMRIF" is an automatic company process that applied equally to Myers and other employees.  (Doc. 31-5 (Kellermeyer Decl.) at ¶¶ 4, 5.)  "[E]very month or two," The Shelly Company's payroll system generated data identifying employees "without payroll activity in the last six months."  (*Id.* at ¶ 5.)  These employees were marked "TERMRIF" and removed from the payroll system.  (*Id.* ¶¶ 4, 5.)  They remained eligible for rehiring.  (Doc. 31-1 (Martin Decl.) at ¶ 6.)

Myers was seasonally laid off on November 17, 2022.  (*Id.*)  Beginning on May 5, 2023, The Shelly Company began contacting Myers with work opportunities.  (Doc. 31-2 (Dvorak Decl.) at ¶¶ 11-15; *id.* at 208, 210, 212-13; Doc. 29 at 143-45; *see also* Doc. 31-3 at 232-38, Nos. 7-10.)  Between May 5 and May 18, 2023, Myers turned down or did not timely respond to multiple placements.  (*Id.*)  Having not accepted employment with The Shelly Company prior to May 20, 2023, Myers was marked "TERMRIF" in their system.  (Doc. 31-1 (Martin Decl.) at ¶ 6; Doc. 31-2 (Dvorak Decl.) at ¶ 16; Doc. 31-5 (Kellermeyer Decl.) at ¶¶ 3-8.)  A new personnel coordinator, who was hired after Eicher resigned on May 12, 2023, was then unaware of Myers' contact information because it had been removed from the system.  (Doc. 31-2 (Dvorak Decl.) at ¶¶ 16, 17.)

That Myers was subject to an automatic administrative process does not constitute an adverse employment action, specifically because The Shelly Company attempted to offer her multiple opportunities for work prior to her "TERMRIF" status.  Myers correctly alludes to Title

VII's language that "to fail or refuse to hire" an individual is an adverse employment action.  *See* 42 U.S.C. § 2000e-2(a); (Doc. 35 at 307.)  But it was Myers that refused work or failed to timely respond when The Shelly Company attempted to rehire her.  The Shelly Company's "adverse action" resulted from Myers' failure to accept new job offers or promptly return their calls.  Myers has not put forth any Rule 56 evidence to refute these facts.  She has not met her burden of proving she was subject to an adverse employment action.

### 3.    Causation

To establish causation, Myers must prove her "protected activity was the but-for cause of an adverse employment action."  *Kenney v. Aspen Techs., Inc.*, 965 F.3d 443, 448 (6th Cir. 2020).  "Although temporal proximity itself is insufficient to find a causal connection, a temporal connection coupled with other indicia of retaliatory conduct may be sufficient to support a finding of a causal connection."  *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 737 (6th Cir. 2006).  In addition, "an intervening cause between protected activity and an adverse employment action dispels any inference of causation."  *Kenney*, 965 F.3d at 450; *Wasek*, 682 F.3d at 472 (finding that the plaintiff could not meet the causation prong of his retaliation claim because the "[plaintiff's] decision to leave the worksite was an intervening event").

The Shelly Company argues Myers cannot establish her internal complaint was the "but-for" cause of, "or even a factor in, any delay in being offered work" or "her ultimate removal from the eligible to work list."  (Doc. 31 at 166.)  The Shelly Company attempted to offer Myers multiple work opportunities before she was marked "TERMRIF" and removed from their administrative system.  (*Id.*)  In opposition, Myers argues she complained on March 9, 2023, and was removed from the recall list by May 2023.  (Doc. 35 at 307.)  To Myers, "[t]he temporal proximity is sufficient, combined with other circumstantial evidence, to create an inference of

retaliation." (*Id.*)  But she does not provide the Court with any evidence, let alone circumstantial evidence, in support .  (*See* Doc. 35.)

"[T]emporal proximity, standing alone, is not enough to establish a causal connection for a retaliation claim." *Spengler v. Worthington Cylinders*, 615 F.3d 481, 494 (6th Cir. 2010); *but see Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525-26 (6th Cir. 2008) (reasoning that temporal proximity may be enough when it so closely follows the protected activity that there would be no other evidence to couple with the temporal proximity).  To Myers, the temporal proximity between her complaint to Dvorak and her adverse employment action could be viewed in two ways: (1) the time between Myers' complaint and her removal from the eligible worker list or (2) from the time of her complaint to her receiving job placements in "bad faith."  (Doc. 35 at 307.)  The difference in length between the two periods is a matter of days.

Each view fails to establish causation for the same reasons.  To start, following her complaint, Dvorak directed Eicher, the personnel coordinator, and Juhasz to contact Myers with work opportunities.  (Doc. 31-2 (Dvorak Decl.) at ¶¶ 11-15; *id.* at 208, 210, 212-13; Doc. 29 at 143-45; *see also* Doc. 31-3 at 232-38, Nos. 7-10.)  Myers was offered multiple work opportunities which she delayed responding to or turned down.  (*Id.*)  Myers' removal from the eligible worker list happened as the result of an automatic process after six months of inactivity.  (Doc. 31-1 (Martin Decl.) at ¶ 6; Doc. 31-2 (Dvorak Decl.) at ¶ 16; Doc. 31-5 (Kellermeyer Decl.) at ¶¶ 3-8.)  The administrator who oversaw this process had no knowledge of her complaint.  (Doc. 31-5 (Kellermeyer Decl.) at ¶¶ 7, 8.)  Myers offers no proof beyond temporal proximity to prove causation.  (*See* Doc. 35 at 307.)  Temporal proximity is negated if there is an "obviously nonretaliatory basis" for an adverse employment action.  *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 401 (6th Cir. 2010).  There are many here, including Myers's own

failure to timely respond to The Shelly Company's work offers and equally applied administrative procedures.  Myers offers no evidence to refute these facts.  She has failed to meet her burden in establishing causation.

 Accordingly, Myers has failed to establish a *prima facie* case for retaliation.

### 4.    Pretext

Even assuming Myers established her *prima facie* case of retaliation (which she did not), The Shelly Company articulated a legitimate, non-discriminatory reason for not rehiring her. They put forth evidence that Myers responded late to work assignments or declined them.  (Doc. 31-2 (Dvorak Decl.) at ¶¶ 11-15; *id.* at 208, 210, 212-13; Doc. 29 at 143-45; *see also* Doc. 31-3 at 232-38, Nos. 7-10.)  The burden shifts to Myers to demonstrate The Shelly Company's reasons were pretextual.  *See Imwalle*, 515 F.3d at 544.

"Plaintiffs typically show pretext in one of three ways: '(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that the proffered reasons were insufficient to motivate the employer's action.'"  *Miles v. S. Cent. Hum. Res. Agency, Inc.*, 946 F.3d 883, 888 (6th Cir. 2020) (quoting *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009)).

To Myers, the work assignments The Shelly Company offered her were in "bad faith" because they were "last minute, far outside of her usual work area, and after others had already been placed."  (Doc. 35 at 307.)  She also questions the "alleged 'automated removal' process," noting that it "conveniently coincided with her complaint."  (*Id.*)  In reply, The Shelly Company highlights that Myers failed to support her arguments with any evidence.  (Doc. 36 at 318-20.)

Here, The Shelly Company put forth declarations, deposition testimony, contemporaneous text messages, and deemed admissions to show that employees attempted to

offer Myers work assignments, but she responded too late or declined them.  (Doc. 31-2 (Dvorak Decl.) at ¶¶ 11-15; *id.* at 208, 210, 212-13; Doc. 29 at 143-45; *see also* Doc. 31-3 at 232-38, Nos. 7-10.)  After six months of inactivity, she was removed from the eligible worker list because of an automatic process.  (Doc. 31-1 (Martin Decl.) at ¶ 6; Doc. 31-2 (Dvorak Decl.) at ¶ 16; Doc. 31-5 (Kellermeyer Decl.) at ¶¶ 3-8.)  Although Myers references this evidence, she has not put forth any evidence of her own to dispute it, as she must.  The retaliation claim fails as a matter of law.

## III.   CONCLUSION

For the reasons stated herein, Defendant The Shelly Company's Motion for Summary Judgment (Doc. 31) is GRANTED.


**IT IS SO ORDERED.**


**Date:**  March 9, 2026                                          _____

BRIDGET MEEHAN BRENNAN
UNITED STATES DISTRICT JUDGE